IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM C. GUTHRIE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 05-1716 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.  INTRODUCTION

Plaintiff, William C. Guthrie, seeks judicial review of a
decision of defendant, Commissioner of Social Security ("the
Commissioner"), denying his application for supplemental security
income ("SSI") under Title XVI of the Social Security Act, 42
U.S.C. §§ 1381-1383f.  Presently before the Court are the
parties' cross-motions for summary judgment pursuant to Rule 56
of the Federal Rules of Civil Procedure.  For the reasons set
forth below, the parties' cross-motions for summary judgment will
be denied and the case remanded to the Commissioner for further
proceedings.

## **II. Background**

### **A. Procedural History**

Plaintiff protectively filed an application for SSI on March 29, 2000, alleging disability since November 30, 1997 due to emphysema, removal of a kidney, arthritis in his back, dizziness and a drinking problem.[1]  (R. 46-48, 57-66).  On January 19, 2001, plaintiff's application was denied by the Social Security Administration (R. 37-40), and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. 41).

On December 10, 2001, a hearing was held before ALJ James J. Pileggi.  Plaintiff, who was represented by counsel, testified at the hearing.  (R. 219-42).  On March 12, 2002, ALJ Pileggi issued a decision denying plaintiff's application for SSI. Specifically, ALJ Pileggi determined that, although plaintiff suffered from severe impairments (chronic obstructive pulmonary disease ("COPD") and arthritis in his low back) and was unable to

---

[1]In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

2

perform the full range of light work,[2] plaintiff retained the
residual functional capacity ("RFC") to perform work existing in
significant numbers in the national economy.[3]  (R. 10-19).
Plaintiff requested review of ALJ Pileggi's decision; however,
the request was denied by the Appeals Council on May 10, 2002.
(R. 4-5).

Plaintiff appealed the Commissioner's final decision denying
his application for SSI to this Court and the case was assigned
to the Honorable Gustave Diamond (Civil Action No. 02-1219).  On
November 25, 2002, the Commissioner moved to remand the case "in
order that the ALJ may obtain vocational expert evidence
regarding the extent to which the light occupational base is
eroded by Plaintiff's non-exertional pulmonary limitations."  (R.

---

[2]The Social Security Regulations define light work as
follows: "Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to
10 pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls.  To be
considered capable of performing a full or wide range of light
work, you must have the ability to do substantially all of these
activities.  If someone can do light work, we determine that he
or she can also do sedentary work, unless there are additional
limiting factors such as loss of fine dexterity or inability to
sit for long periods of time."  20 C.F.R. § 404.1567(b)

[3]RFC is the most a disability claimant can still do despite
his or her limitations.  20 C.F.R. § 404.1545(a).

292-95).  The motion to remand was granted by Order dated
November 26, 2002, and the case was closed.[4]  (R. 296-97).

A further hearing before ALJ Pileggi was held on June 4,
2003.  Plaintiff, who was represented by counsel, and a
vocational expert ("VE") testified at the hearing.  (R. 265-91).
On August 29, 2003, ALJ Pileggi issued another adverse decision.
Specifically, ALJ Pileggi concluded that, despite severe
impairments (COPD, osteoarthritis in his back and alcoholism) and
an inability to perform the full range of light and sedentary
work, plaintiff retained the RFC to perform light and sedentary
work existing in significant numbers in the national economy,
including the light jobs of gate guard, carrier/runner and
information clerk and the sedentary jobs of routing clerk,
surveillance system monitor and assembler.[5]  (R. 253-63).

---

[4]On January 25, 2003, the Appeals Council entered an Order
vacating ALJ Pileggi's decision and remanding the matter for
further proceedings, *i.e.*, to obtain vocational expert testimony.
(R. 298-99).

[5]The Social Security Regulations define sedentary work as
follows: "Sedentary work involves lifting no more than 10 pounds
at a time and occasionally lifting and carrying articles like
docket files, ledgers, and small tools.  Although a sedentary job
is defined as one which involves sitting, a certain amount of
walking and standing is often necessary in carrying out job
duties.  Jobs are sedentary if walking and standing are required
occasionally and other sedentary criteria are met."  20 C.F.R.
§ 404.1567(a).

4

Plaintiff requested review of ALJ Pileggi's August 29, 2003 decision. (R. 246). However, the Appeals Council denied the request on October 7, 2005. (R. 243-45). This appeal followed.

## B. Plaintiff's Hearing Testimony

At the hearings before ALJ Pileggi, plaintiff testified, in summary, as follows:

### Hearing on December 10, 2001

Plaintiff was born on March 14, 1957,[6] and he has a ninth grade education. (R. 223). Plaintiff is divorced, and, at the time of the first hearing, plaintiff's 18 year old son resided with him. All of plaintiff's employment in the fifteen years preceding the hearing was in the construction industry (concrete finishing and masonry), and he last worked in October 1997.[7] (R. 224-26). Plaintiff has a driver's license; however, he does not drive "much at all" due to his medications, blackouts, seeing spots if he turns his head too far and sneezing attacks.[8] (R. 226).

---

[6]Plaintiff was 44 years old at the time of the first hearing before ALJ Pileggi.

[7]Plaintiff testified that he worked for his father who owned a construction company. (R. 225).

[8]With respect to driving, plaintiff also testified that he could not drive to the doctor's office to get his blood pressure checked three times a week as recommended because he does not own a vehicle. (R. 233).

5

With respect to medical conditions, plaintiff suffers from high blood pressure which causes headaches on a regular basis. He has been hospitalized for high blood pressure on several occasions.  Plaintiff also takes medication for dizziness which causes spots before his eyes.  Plaintiff also suffers from emphysema and allergies which result in breathing problems.  He uses inhalers and takes Claritin to treat these problems.[9] Plaintiff also has a history of kidney cancer which resulted in the removal of his right kidney, and plaintiff experiences "killer pain" whenever he urinates.  Plaintiff also suffers from severe back pain due to an automobile accident in 1975 during which he fractured his back in two places and due to working construction jobs all his life.  Sitting in a recliner is the "best thing" plaintiff can do to relieve his back pain, and he sits in a recliner "most of the day."  At the time of the hearing, plaintiff had a hiatal hernia for which he was taking three medications, a cancerous mole on the side of his head, and cysts on various parts of his body which have to be removed surgically.  (R. 226-31).  Plaintiff's medications make him drowsy,[10] and they do not relieve his back pain or his headaches.

_____

[9]Plaintiff testified that he was experiencing shortness of breath during the hearing from "just talking."  (R. 228).

[10]Plaintiff testified that he never takes his medications when he "travel[s] somewhere" because they make him drowsy. Thus, on the day of the hearing, he had not taken his medications.  (R. 233-34).

6

In fact, plaintiff believed that the medications caused his "real bad" stomach problems.  (R. 233-34, 236).

Plaintiff is unable to read due to concentration problems. If necessary, documents are read to him by his son or a friend. (R. 232).  Plaintiff is a smoker.  He also drinks alcohol "occasionally," i.e., during ball games and races.  (R. 234-35). Plaintiff can walk no more than a couple of hundred of feet before he is "out of wind" due to shortness of breath and back pain.  Plaintiff is unable to estimate how long he can stand on an average day because sometimes standing "doesn't bother [him], and sometimes it's just like really bad."  Plaintiff can sit 45 minutes to an hour if he is sitting in a comfortable chair.[11] (R. 238-39).  Plaintiff has difficulty lifting objects and picking things up from the floor.  He can lift a 5-pound bag of sugar and a gallon of milk.  If he needs an object lifted that weighs 10 pounds or more, his son or a friend lifts the object for him.  (R. 239).  Plaintiff spends his days watching television and sleeping.  He does no household chores.  (R. 240).

### Hearing on June 4, 2003

At the time of the second hearing before ALJ Pileggi, plaintiff's son, who was 20 years old, no longer resided with

---

[11]In this regard, plaintiff also testified that if he is sitting in a comfortable chair, he can sit through a movie and long enough to play a game of cards.  (R. 237).

7

him, and plaintiff was living alone in a camper.  (R. 270).
Although alcohol was problem for plaintiff at one time, it was no
longer "much of a problem."[12]  (R. 271).

    Occasionally, plaintiff experiences uncontrollable bowel
movements.  At other times, he is constipated for weeks at a
time.  Plaintiff was scheduled for a colon examination in the
near future.  (R. 272-73).  Plaintiff also was scheduled to have
a lump on his throat removed the week after the hearing, and,
because of severe pain when he coughed or sneezed, he was
anticipating further surgery for a hernia which had been repaired
in the past.  (R. 273-74).  With respect to his history of kidney
cancer resulting in the removal of his right kidney, a recent CAT
scan showed a tumor on plaintiff's left kidney and he experienced
burning upon urination.  (R. 274).

    At the time of the hearing, plaintiff's lung condition was
continuing to worsen.  It was difficult for plaintiff to talk,
his lungs burned "all the time," he experienced shortness of
breath, and he coughed "a lot."  (R. 274-75).  Plaintiff also has
congestive heart failure, and his treating cardiologist suggested
that he use oxygen.  (R. 275).  Plaintiff continued to suffer
from "massively high" blood pressure resulting in frequent

---

[12]With respect to alcohol, plaintiff testified that he
"drink[s] six on Sunday when we watch a race or a football game."
(R. 271).

headaches and dizziness.  Plaintiff had reduced his cigarette
smoking to a half a pack a day.  (R. 276-77, 281).  Plaintiff
continued to use two inhalers "quite a bit," and he continued to
take numerous medications which cause drowsiness.  One of
plaintiff's medications ("a fluid pill") caused him to get "up
and down all night" to go to the bathroom.  (R. 277-78).  As a
result, plaintiff "sleep[s] most of the day away."  (R. 279).
Plaintiff continued to suffer from constant back pain.[13]  He also
suffered from knee pain as a result of a car accident and
performing concrete work in the past.  (R. 279).  With respect to
daily activities, plaintiff watched television.  (R. 280).

## C. Vocational Expert Testimony

Joseph J. Kuhar testified as a vocational expert at the
hearing before ALJ Pileggi on June 4, 2003.  ALJ Pileggi asked
Mr. Kuhar to assume a hypothetical person of plaintiff's age
(46), education (9th grade) and work experience (construction
laborer) who was limited to performing light work with the
following limitations:[14]  (1) due to lung problems, the person

_____

[13]Regarding plaintiff's back pain, plaintiff testified that
he "can barely even walk" on some days.  As a result, he reclines
most of the day, keeping a bedpan nearby in case he cannot get
up.  (R. 280).

[14]With respect to plaintiff's past work as a construction
laborer, Mr. Kuhar classified plaintiff's masonry work as
unskilled and heavy and his cement finishing work as semi-skilled
and heavy.  (R. 286).

9

would not be able to work in an environment with pulmonary irritants, such as smoke, dust and fumes; (2) due to dizziness, the person would not be able to work at heights or engage in any significant climbing activities; and (3) due to bowel or bladder problems, the person would need to work in reasonable proximity to restroom facilities. ALJ Pileggi then asked Mr. Kuhar whether there were any jobs the hypothetical person could perform. Mr. Kuhar responded affirmatively, identifying the light jobs of security/gate guard, courier/runner and desk/information clerk. (R. 286-87).

ALJ Pileggi then asked Mr. Kuhar to assume the same hypothetical person with the exception that the person was limited to performing work at the sedentary level. In response to ALJ Pileggi's inquiry into whether there were any jobs that this hypothetical person could perform, Mr. Kuhar again responded affirmatively, identifying the sedentary jobs of routing clerk, surveillance system monitor and assembler. (R. 287-88).

### D. Medical Evidence

The medical evidence in the administrative record in this case may be summarized as follows:

**1. Records of Alexander D. Limkakeng, M.D. - 12/18/97 to 3/8/99**

Plaintiff was referred to Dr. Alexander D. Limkakeng following a CT scan on December 18, 1997, which showed a mass on

10

plaintiff's right kidney. Dr. Limkakeng ordered a renal arteriogram, which confirmed the presence of a tumor on plaintiff's right kidney. (R. 116-17). On January 29, 1998, Dr. Limkakeng performed a radical right nephrectomy on plaintiff. Pathology tests revealed renal cell carcinoma without involvement of venous structures. (R. 123-30). During a follow-up visit on February 13, 1998, Dr. Limkakeng noted that plaintiff's wound looked "good" and he removed the staples.[15]  (R. 115).

During a follow-up visit on March 2, 1998, Dr. Limkakeng noted that plaintiff was doing well; that his wound had healed; and that he would see plaintiff in 6 weeks and then every 6 months thereafter. (R. 115). A CT scan performed on August 20, 1998 revealed a "small probable cyst" on plaintiff's left kidney. (R. 139). Another CT scan on March 3, 1999 showed no significant change in the size or appearance of the cyst on plaintiff's left kidney. This CT scan also showed pleural thickening in the base of plaintiff's right lung. (R. 138). During a follow-up visit on March 8, 1999, Dr. Limkakeng noted that these conditions would be watched by yearly CT scans. (R. 113).

---

[15]On February 18, 1998, plaintiff was seen by a physician at the Oncology Clinic of United Community Hospital for an opinion concerning "adjuvant therapy" in light of the fact that x-rays confirmed "what appeared to be a complete resection" of his right kidney. After examining plaintiff and reviewing his records, the physician opined that plaintiff would receive no benefit from adjuvant therapy, such as chemotherapy and Interferon. (R. 121-22).

11

**2. Records of United Community Hospital - 4/11/99 to 4/16/99**

On April 11, 1999, plaintiff was treated in the Emergency
Department of United Community Hospital for injuries sustained in
a fight. Plaintiff reported that he had been kicked in the
kidney area and urinalysis showed some hematuria. Plaintiff was
admitted for observation and discharged on April 16, 1999. (R.
86-87).

**3. Medical Imaging Report - 5/21/99**

An MRI of plaintiff's lumbar spine was performed on May 21,
1999. The results were described as follows:

IMPRESSION:    1. Degenerative disc disease at T11-12 with a
               bulging disc, which is asymmetric to the left
               resulting in mild stenosis.
               2. Mildly bulging disc at L3-4, also asymmetric to
               the left.
               3. Otherwise, unremarkable lumbar spine.

(R. 137).

**4. Records of United Community Hospital - 8/19/99**

On August 19, 1999, plaintiff went to the Emergency
Department of United Community Hospital complaining of a "massive
headache" for 4 days with vomiting. The intake record notes
plaintiff's history of chronic breathing problems, renal cancer,
high blood pressure and back problems. The intake record also
notes that plaintiff smelled of alcohol. Plaintiff was treated
with Toradol and discharged. (R. 159-61).

12

### 5. Records of Randy M. Kreider, M.D. - 8/99

In August 1999, plaintiff saw Dr. Randy M. Kreider, his primary care physician, for a follow-up visit for chronic hepatitis.[16]  Dr. Kreider noted that plaintiff "still has some alcohol on a daily basis," and that plaintiff "gets [shortness of breath] with any activity."  Dr. Kreider's assessment included asthma, anxiety and alcoholic hepatitis, and he noted that plaintiff "is permanently disabled from [asthma and anxiety], has been unable to work since 1988."  Dr. Kreider instructed plaintiff to avoid all alcohol, and he recommended that plaintiff discontinue the use of tobacco.[17]  (R. 150).

During a further follow-up visit on August 10, 1999, Dr. Kreider reviewed plaintiff's lab test results, noting that his liver function studies remained at "about the same" level of elevation.  Dr. Kreider discussed a gastrointestinal ("GI") referral with plaintiff, noting that such a referral would be made at that time, rather than waiting two months.[18]  (R. 150).

---

[16]Dr. Kreider's records are illegible with respect to the specific day of this follow-up visit in August 1999.  (R. 150).

[17]Dr. Kreider's records include the results of lab tests on August 23, 1999, indicating that plaintiff tested positive for the Hepatitis C virus.  (R. 153).

[18]With respect to this reference to a GI referral, there is a handwritten note on Dr. Kreider's records indicating that plaintiff was scheduled to see Dr. Kenny in his Grove City office on September 13, 1999.  (R. 150).  If plaintiff saw Dr. Kenny as noted, there are no records of the office visit in his case file.

13

**6. Report of Initial Evaluation by Mark A. Fye, M.D. -**
**10/25/99**

On October 25, 1999, plaintiff was evaluated by an

orthopedic specialist, Dr. Mark A. Fye, in connection with his

history of chronic low back pain. With respect to plaintiff's

physical examination, Dr. Fye noted that plaintiff was "a

healthy-appearing male in mild distress from his low back pain;"

that an inspection of the soft tissue in plaintiff's lumbar spine

was unremarkable; that plaintiff had decreased range of motion in

all directions of the lumbar spine due to pain, but his straight

leg raising tests in the supine and sitting positions were

negative; and that plaintiff was intact neurologically with

respect to motor, sensory and reflexes of both lower extremities.

Dr. Fye also noted that x-rays of plaintiff's lumbar spine, which

had been taken 2 years before the evaluation, were unremarkable,

and that an MRI scan of plaintiff's lumbar spine, which had been

performed the previous May, revealed only some mild degenerative

changes. Dr. Fye's impression was "chronic low back pain, most

likely soft tissue in origin," and he opined that neither

surgical intervention nor injections were warranted. Dr. Fye

---

There is, however, a copy of the report of an ultrasound of
plaintiff's abdomen on November 16, 1999, which was ordered by
Dr. Gerard F. Kenny. The report indicates that the abdominal
ultrasound was negative. (R. 151).

14

recommended that plaintiff continue taking anti-inflammatories and continue his home exercise program.  (R. 105-07).

**7. Records of Randy M. Kreider, M.D. - 12/30/99 to 2/21/00**

On December 30, 1999, plaintiff saw Dr. Kreider for a follow-up visit in connection with his chronic low back pain. Plaintiff reported continued use of tobacco and "some alcohol intake."  Plaintiff also reported experiencing "chest pain off and on" for which he had been hospitalized in July or August with a negative treadmill test, and he "wonder[ed]" if the chest pain was related to his lung condition.[19]  Dr. Kreider's assessment included chronic low back pain, hypertension, chest pain, COPD, dizziness and abdominal pain.  Dr. Kreider indicated that he would get the records from United Community Hospital relating to plaintiff's evaluation for chest pain, and that additional cardiac testing would be considered if plaintiff's chest pain persisted.  Dr. Kreider explained to plaintiff the importance of using his inhalers to control his COPD.  (R. 370).

---

[19]With respect to plaintiff's report that he had been hospitalized in July or August of 1999 for chest pain, the Court's review of the administrative record does not reveal any records pertaining to an inpatient hospitalization during this time period.  As noted previously, the administrative record does include records of a visit by plaintiff to the Emergency Department of United Community Hospital on August 19, 1999, during which plaintiff complained of a "massive headache" of 4 days' duration.  However, the records of this Emergency Department visit do not reflect any complaints of, or treatment for, chest pain and do not include any results of cardiac testing.   (R. 160-66).

15

During an office visit with Dr. Kreider on January 27, 2000, plaintiff reported that he drinks "a lot of alcohol 12 per day, enjoys it, does not want to quit, has vomiting of dry heaves, a little green phlegm in the morning, better later in the day, appetite OK."[20]  Dr. Kreider's assessment included hypertension, chronic low back pain, alcoholic hepatitis and alcoholism.  Dr. Kreider explained the importance of alcohol rehabilitation to plaintiff; however, plaintiff stated that he was not interested at that time.  Dr. Kreider also explained to plaintiff that alcohol elevated his blood pressure, caused stomach upset and reduced the effectiveness of one of his medications.  Plaintiff indicated that he understood these facts, as well as the fact that he was sustaining liver damage as a result of his ingestion of alcohol, which could be permanent and progressive.  (R. 369).

During a follow-up visit with Dr. Kreider on February 21, 2000, plaintiff reported no chest pain, shortness of breath or bowel problems and indicated that he "still enjoys his alcohol." Dr. Kreider's assessment included hypertension and alcoholic excess with elevated liver function studies.  (R. 368).

---

[20]In a note dated January 20, 2000, Dr. Kreider indicated that plaintiff's cardiac testing in June, 1999 showed possible alcoholic cardiomyopathy.  (R. 369).

16

**8. Employability Assessment Form - 3/29/00**

In an Employability Assessment Form completed for the Pennsylvania Department of Public Welfare on March 29, 2000, Dr. Limkakeng, the surgeon who removed plaintiff's right kidney in January 1998, opined that plaintiff was permanently disabled, noting plaintiff's primary diagnosis of kidney cancer and secondary diagnoses of chronic back pain and alcoholism. (R. 109).

**9. Records of Randy M. Kreider, M.D. - 5/15/00**

On May 15, 2000, plaintiff saw Dr. Kreider for a follow-up visit for chronic low back pain which was getting progressively worse, despite the use of Vicodin. In addition to back pain, plaintiff reported painful urination "off and on since 1998 when he had his kidney removed for renal [cancer]." Dr. Kreider noted that plaintiff's liver function studies were "chronically elevated due to alcoholism." (R. 367).

**10. Report of CT Scan - 5/26/00**

On May 26, 2000, plaintiff underwent an abdominal and pelvic CT scan. The impression was described as follows:

IMPRESSION:    1. Surgically absent right kidney.
               2. Small amount of free fluid within the pelvis of
               uncertain etiology and significance.

(R. 157).

17

**11. Report of Shubhada Sawardekar, M.D. - 8/9/00**

On August 9, 2000, plaintiff underwent a consultative
examination by Dr. Shubhada Sawardekar at the request of the
Pennsylvania Bureau of Disability Determination ("PaBDD").   Dr.
Sawardekar noted that plaintiff took a long time to answer her
questions, which she believed was an attempt to manipulate his
responses.  With respect to his medical problems, plaintiff
reported that he has high blood pressure, and that he sometimes
forgets to take his medication for this condition.[21]  Plaintiff
also reported that he suffers from emphysema; that he began to
smoke cigarettes at age 11 and had smoked two packs per day for
32 years; that he had no intention of reducing or stopping his
tobacco use; that he was able to walk about one block or 10
minutes without getting short of breath; and that he used two
inhalers on an "as needed" basis.  Plaintiff also reported a
history of right kidney removal by Dr. Limkakeng in January 1998,
noting that he has a growth on his left kidney and that he
experiences burning upon urination at times.  Finally, plaintiff
reported that he suffers from arthritis and back problems,
stating that he broke his back in an automobile accident in 1975.
(R. 88-89).

---

[21]In this connection, Dr. Sawardekar noted that at the time
she examined plaintiff on August 9, 2000, his blood pressure
(207/122) was "very high."   (R. 88).

18

As to "Social History," plaintiff reported, among other things, that he drinks alcohol on a regular basis, and that he "drinks two beers every morning to clean up his kidneys." (R. 89). With respect to her "Review of Systems," Dr. Sawardekar noted that a review of plaintiff's eyes revealed blurry vision; that a review of plaintiff's mouth and throat revealed recurrent sinusitis; that a review of plaintiff's respiratory system revealed emphysema; that a review of plaintiff's circulatory system revealed an enlarged heart, high blood pressure and edema in plaintiff's hands and feet; that a review of plaintiff's GU system revealed a nephrectomy with urinary burning; that a review of plaintiff's musculoskeletal system revealed arthritis and back pain; and that, psychologically, plaintiff claimed to be depressed. Finally, regarding plaintiff's "Physical Examination," Dr. Sawardekar noted that plaintiff was a "43 year old, unkept, Caucasian male who was unclean;" that plaintiff did not appear to be in acute distress; that plaintiff's lungs revealed decreased breath sounds but no wheezing, rhonchi or crepitation; that plaintiff could bend at the lumbar spine "fairly" well, although he said it caused problems; that no joint swelling or muscle atrophy were noted; that plaintiff's face appeared slightly swollen and flushed, suggesting alcohol abuse; that tremors were noted in plaintiff's upper and lower extremities, also suggesting alcohol abuse; that plaintiff did

19

not require an assistive device to ambulate; that,

neurologically, plaintiff was alert and oriented, although he was

taking long pauses before answering her questions; and that

plaintiff's motor, sensory and deep tendon reflexes were

essentially normal.  Dr. Sawardekar's impression included (1)

hypertension, uncontrolled, (2) COPD secondary to heavy smoking

for the past 30+ years, (3) right nephrectomy and history of

kidney cancer, and (4) arthritis in the lower back.[22]  (R. 90-

91).

**12. Records of Randy M. Kreider, M.D. - 8/21/00 to 9/11/00**

Plaintiff saw Dr. Kreider on August 21, 2000 because his

blood pressure had been very elevated during the consultative

examination by Dr. Sawardekar the previous week.  Dr. Kreider

---

[22]Dr. Sawardekar also completed a Medical Source Statement of
Claimant's Ability to Perform Work-Related Physical Activities in
connection with her consultative examination of plaintiff on
August 9, 2000.  It was clear, however, that Dr. Sawardekar
completed the statement based on plaintiff's representations
during the consultative examination, rather than her own opinions
of plaintiff's limitations following the examination.  As a
result, Dr. Sawardekar was contacted by the Pennsylvania Bureau
of Disability Determination to provide further information
concerning her examination of plaintiff and his functional
limitations.  In summary, Dr. Sawardekar indicated that she
"[did] not feel equipped" to complete a medical source statement
after spending only one hour with a patient; that plaintiff's
motor power was 5/5 throughout; that plaintiff's sensory exam by
pinprick in his lower extremities was negative; that plaintiff's
coordination and gait were normal; that plaintiff was able to
walk into and out of her office without difficulty; and that,
despite his complaints of back pain, plaintiff "could probably"
perform jobs which required him to stand most of the day.  (R.
97-98).

20

noted that plaintiff usually drinks alcohol on a daily basis, but
that he had not consumed any alcohol since the previous Friday
because he did not feel well. Dr. Kreider checked plaintiff's
blood pressure multiple times, and none of the readings were
elevated. Dr. Kreider's assessment included hypertension and
alcoholism, and the doctor noted his belief that plaintiff's
blood pressure drops when he stops drinking. Dr. Kreider
explained the importance of avoiding alcohol to plaintiff, *i.e.*,
he may be able to avoid blood pressure medication if he quit.
(R. 366). During a follow-up visit two days later, plaintiff
reported feeling better, and Dr. Kreider prescribed a new blood
pressure medication for plaintiff. (R. 365).

During a follow-up visit with Dr. Kreider on September 11,
2000, plaintiff's blood pressure was 120/70. Plaintiff reported
feeling better overall, although he had had a "little alcohol"
that day. Dr. Kreider's assessment included hypertension,
chronic low back pain and gastroesophageal reflux disease
("GERD"). Dr. Kreider recommended alcohol rehabilitation to
plaintiff again, explaining that he would need less blood
pressure medication if he stopped drinking alcohol. Plaintiff
was instructed to notify Dr. Kreider if he reduced his alcohol
intake because his blood pressure medication would need to be
adjusted. (R. 364).

21

**13. Report of Robert P. Craig, Ph.D. - 10/16/00**

On October 16, 2000, plaintiff underwent a consultative psychological evaluation by Robert P. Craig, Ph.D. at the request of the PaBDD. Plaintiff reported that he was taking Prilosec, Zestril, MCTZ, Reglan, Neurontin, Vicodin, Flexeril and Claritin and using Albuterol and Azmacort inhalers, and that he experienced no problems from any of his medications. Plaintiff also reported that he had been in drug and alcohol rehabilitation in the past; that he had been dishonorably discharged from the Marines; that he cannot read; and that he is fearful of heights. (R. 99-100).

With respect to plaintiff's mental status examination, Dr. Craig noted that, generally, plaintiff's behavior and psychomotor activity during the examination were normal and his speech was reasonable. Plaintiff reported that he had been depressed for 5 years since the end of his second marriage, but that he had never been involved in therapy. Dr. Craig reported that, generally, plaintiff's mood, feelings and affect appeared to be appropriate for the circumstances; that plaintiff's stream of thought, productivity and continuity were good with no language impairments noted; that there was no indication of any delusions or ideas of reference or influence; that plaintiff could not perform serial 7's; that plaintiff appeared to be "reasonably well" oriented to time, place and person; that plaintiff reported

22

poor impulse control, citing a long history of a "short fuse" resulting in chronic fighting and incarceration; and that plaintiff's social judgment, test judgment and insight were poor. Dr. Craig's diagnostic impression was (1) depressive disorder, NOS, (2) dysthymic disorder, (3) alcohol dependence, and (4) personality disorder, NOS. Dr. Craig described plaintiff's prognosis as "poor." (R. 100-01).

With respect to making occupational adjustments, Dr. Craig rated plaintiff's ability to deal with the public and work stresses and his ability to maintain attention and concentration as "poor to none." As to making performance adjustments, Dr. Craig rated plaintiff's ability to understand, remember and carry out complex job instructions as "poor to none." Finally, in connection with making personal-social adjustments, Dr. Craig rated plaintiff's ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability as "fair." (R. 103-04).

**14. Records of Randy M. Kreider, M.D. - 10/20/00**

During a follow-up visit with Dr. Kreider for hypertension on October 20, 2000, plaintiff reported that he had consumed 6 beers the previous day and one beer that morning. Plaintiff's blood pressure was 160/100, and he informed Dr. Kreider that he still smoked and that it was "hard to give up the alcohol." Dr. Kreider's assessment included hypertension, alcoholism, renal

23

cancer and vomiting due to alcohol, and the doctor explained the importance of avoiding alcohol to plaintiff. (R. 363).

## 15. Pulmonary Function Test Report - 11/21/00

Plaintiff underwent a pulmonary function test on November 21, 2000 in connection with his COPD and application for SSI. The impression was described as follows: (1) Moderately severe obstructive pulmonary disease, (2) No hyperinflation, (3) Small airways disease, (4) Post bronchodilator spirometry does not demonstrate evidence of improvement with the use of Albuterol, and (5) Effort for the test was suboptimum. As to recommendations, the report states, among other things, that plaintiff "must" discontinue smoking. (R. 172).

## 16. Report of Shubhada Sawardekar, M.D. - 12/9/00

On December 9, 2000, plaintiff underwent a further consultative examination by Dr. Sawardekar at the request of the PaBDD. Dr. Sawardekar noted the results of plaintiff's pulmonary function test on November 21, 2000, and she described her impression as follows: 1. Chronic obstructive lung disease, 2. Smoker, 3. Right nephrectomy, with a history of kidney cancer, 4. Arthritis, with low back pain, and 5. Hypertension. Dr. Sawardekar also noted that plaintiff's range of motion and ability to engage in work-related physical activities had improved. (R. 170-71).

24

In a Medical Source Statement of Claimant's Ability to
Perform Work-Related Physical Activities, Dr. Sawardekar opined
that plaintiff could frequently lift and carry 20 pounds and
occasionally lift and carry 25 pounds; that plaintiff could stand
or walk 6 or more hours in an 8-hour workday; that plaintiff
could sit 8 hours in an 8-hour workday with a sit/stand option;
that plaintiff's ability to push and pull with his upper and
lower extremities was unlimited; that plaintiff was limited to
only occasionally crouching and balancing; that plaintiff had
limitations in his ability to reach, handle, finger, feel, see,
hear, speak, taste/smell and with respect to continence; and that
plaintiff's environmental limitations included avoidance of
wetness, dust, fumes, odors, gases and humidity.  (R. 178-79).

**17. Records of Randy M. Kreider, M.D. - 12/13/00**

During a follow-up visit with Dr. Kreider on December 13,
2000, plaintiff reported that his chronic back pain was "about
the same," but that, overall, he was doing well.  Plaintiff also
reported that he continued to smoke and drink.  Dr. Kreider's
assessment included hypertension, alcoholism, possible minimal
abdominal hernia and chronic back pain, and he stressed the
importance of avoiding salt, alcohol and tobacco.  (R. 363).

25

**18. Physical Residual Functional Capacity Assessment -
12/21/00**

On December 21, 2000, a State agency physician, Jay Newberg,
M.D., completed an assessment of plaintiff's physical residual
functional capacity based on a review of plaintiff's file.  Dr.
Newberg opined that plaintiff could occasionally lift and carry
20 pounds and frequently lift and carry 10 pounds; that plaintiff
could stand or walk about 6 hours in an 8-hour workday; that
plaintiff could sit about 6 hours in an 8-hour workday; that
plaintiff's ability to push and pull with his upper and lower
extremities was unlimited; that plaintiff was limited to only
occasionally climbing, balancing, stooping, kneeling, crouching
and crawling; and that plaintiff should avoid even moderate
exposure to fumes, odors, dusts, gases and poor ventilation.  (R.
181-87).

**19. Mental Residual Functional Capacity Assessment - 1/5/01**

On January 5, 2001, a State agency consultant, Sharon
Tartar, Ph.D., completed an assessment of plaintiff's mental
residual functional capacity based on a review of plaintiff's
file.  Dr. Tartar opined, among other things, that plaintiff was
markedly limited in (a) his ability to maintain attention and
concentration for extended periods, (b) his ability to complete a
normal workday and workweek without interruptions from
psychologically based symptoms, and (c) his ability to perform at

26

a consistent pace without an unreasonable number and length of
rest periods.   In elaborating on her opinion concerning
plaintiff's capabilities, Dr. Tartar stated:

> Cl[aimant] is 43 yr. old with [diagnosis] of depressive
> dis[order] & alcohol dependency.  He has 10th grade
> education.  ADLs are aided by his family & friends.  Social
> functioning & concentration are significantly limited.
> Cl[aimant] is not currently capable of performing SGA.
> However, if cl[aimant] would stop abusing alcohol,
> cl[aimant] would be able to perform routine, repetitive
> tasks in a stable environment.  Allegations are credible.

(R. 190-92).

### 20. Records of Randy M. Kreider, M.D. - 1/15/01 to 7/17/01

During a follow-up visit with Dr. Kreider on January 15,
2001, plaintiff reported that his last alcohol consumption
occurred the previous day (at least 8 beers) and that he
continued to drink heavily.  Plaintiff also reported smoking
several packs of cigarettes a day with a sore throat all day
long.  Dr. Kreider noted that plaintiff understood the importance
of not drinking alcohol and decreasing his tobacco use.  Dr.
Kreider also noted plaintiff's inability or lack of desire to
accomplish either of these goals.  Dr. Kreider's assessment
included hypertension, cough due to COPD, chronic back pain,
possible abdominal hernia, alcoholism and tobacco use, and the
doctor stressed the importance of avoiding alcohol to plaintiff.
(R. 362).

27

During a follow-up visit with Dr. Kreider on February 20, 2001, the doctor noted that plaintiff still consumed significant quantities of alcohol with chronically elevated liver function studies. Dr. Kreider explained, again, the importance of not drinking alcohol or smoking, but noted that plaintiff was "unable to change pattern." (R. 361).

On March 15, 2001, plaintiff saw Dr. Kreider complaining of chest pressure for a week which was exacerbated by eating, as well as a sore throat which plaintiff believed was related to his GERD. Plaintiff reported that he drank 3 to 4 beers a day, continued to smoke and ingested a lot of caffeine. An EKG showed no acute change. Plaintiff was instructed to take Prilosec, avoid all alcohol and decrease his caffeine intake. Dr. Kreider noted that he would "discuss smoking later." (R. 360).

During a follow-up visit with Dr. Kreider on March 19, 2001, plaintiff indicated that he needed a prescription for Vicodin for his chronic back pain. Plaintiff also complained of a "very uncomfortable" cyst behind his left ear, and Dr. Kreider noted that he previously had removed a cyst on plaintiff's right ear. Dr. Kreider removed the cyst, indicating that plaintiff tolerated the procedure well. (R. 360).

During an office visit with Dr. Kreider on June 15, 2001, plaintiff presented with swollen ankles and complaints of pain over his liver. Dr. Kreider noted that plaintiff "drinks

28

alcohol, has been through rehab before, does not want to go through it again, understands the importance of not drinking and that alcohol may kill him." Plaintiff denied chest pain but noted that he experienced some shortness of breath with activity. Plaintiff reported continued back pain and requested an injection. Dr. Kreider's assessment included leg edema, shortness of breath with asthma, COPD, chronic low back pain, allergic rhinitis and GERD, and he adjusted plaintiff's medications. Again, Dr. Kreider stressed the importance of not drinking, explaining to plaintiff that it may result in his death due to progressive liver failure.[23]  (R. 358).

In the fall of 2001, plaintiff was referred by Dr. Kreider to Dr. Gabriel Weinberg for "low sodium." Dr. Weinberg's records indicate that plaintiff was seen on November 28, 2001 and December 12, 2001; however, the doctor's office notes are illegible.  (R. 212-15).

Plaintiff saw Dr. Kreider on May 31, 2002 for prescription refills and a re-occurrence of the cyst behind his left ear. Plaintiff's blood pressure was "up" at 170/120, and plaintiff reported that he had not taken his blood pressure medication for

---

[23]It appears that plaintiff had a follow-up visit with Dr. Kreider on June 25, 2001. However, the handwritten notes of this visit are illegible.  (R. 357). Similarly, the handwritten notes relating to an office visit with Dr. Kreider on November 5, 2001 are illegible.  (R. 355).

29

approximately two months because he "just ran out, did not get it filled." Dr. Kreider removed the cyst behind plaintiff's left ear and gave him new prescriptions, including a prescription for his blood pressure medication. (R. 353).

Plaintiff returned to see Dr. Kreider for a follow-up visit on July 17, 2002. Although plaintiff reported that he had not consumed any alcohol that day, Dr. Kreider noted a "marked odor" of alcohol on plaintiff's breath. Plaintiff continued to complain of chronic low back pain and inquired into his need for an injection. Dr. Kreider noted that plaintiff's blood pressure rises when he "drinks too much alcohol," and that plaintiff has chronic borderline sodium levels which the doctor believed was related to plaintiff's alcohol consumption. Dr. Kreider's assessment included hypertension, chronic low back pain, COPD, degenerative joint disease, chronic alcohol hepatitis and hyponatremia. Dr. Kreider stressed to plaintiff the importance of taking his prescribed blood pressure medication, as well as his need to avoid alcohol completely. Dr. Kreider read a narcotic use agreement to plaintiff, and he signed it. (R. 352).

## 21. Records of United Community Hospital - 7/30/02

On July 30, 2002, plaintiff presented to the Emergency Department of United Community Hospital with a complaint of left-sided chest pain radiating into his left arm. Testing revealed high blood pressure and abnormal sodium and potassium levels.

The report indicated that plaintiff's medical history included hypertension, COPD, chronic tobacco abuse, a right nephrectomy secondary to renal cell cancer in 1998, a history of alcoholic cardiomyopathy and an unknown left renal disorder. As to social and family history, the report indicated that plaintiff was "chronically unemployed with a history of alcoholism with multiple complications." Regarding plaintiff's general appearance, the report described plaintiff as having poor hygiene. The examination of plaintiff's lungs showed diffuse right-sided rhonchi with no wheezes, rales or rubs, and the examination of plaintiff's abdomen showed, among other things, no signs of cirrhosis. The report described plaintiff's tentative diagnoses as left chest wall pain, uncontrolled hypertension and critical electrolyte abnormalities. Plaintiff was admitted to the hospital, and his blood pressure was controlled on a Nitroglycerin drip. A 3% saline solution drip also was initiated and plaintiff's medications were resumed. (R. 313-15).

Plaintiff was discharged from the hospital on August 1, 2002 with the following diagnoses: 1. Electrolyte abnormalities (hyperkalemia, hyponatremia), 2. Hypertensive episode, 3. Chronic alcoholism, 4. COPD, 5. Alcoholic cardiomyopathy, 6. Chest wall pain, and 7. History of renal cell carcinoma. With regard to the diagnosis of chronic alcoholism, the hospital's discharge summary states: "The patient does not have any desire to address this in

31

the near future. Rehab and Social Service options were offered and declined." (R. 316).

**22. Records of Randy M. Kreider, M.D. - 8/12/02 to 2/18/03**

On August 12, 2002, plaintiff saw Dr. Kreider for a follow-up visit in connection with his hospitalization for a "probable" myocardial infarction. Plaintiff informed Dr. Kreider that his sodium level was low while he was in the hospital, and that he had been given a prescription for electrolyte medication to take at home. Plaintiff indicated, however, that he had lost the prescription and could not remember the name of the medication. Dr. Kreider noted that plaintiff has a history of heavy alcohol consumption; that prior to his hospitalization, plaintiff had been eating only 1 or 2 meals per week; that although plaintiff presently was eating 2 to 3 meals a day, plaintiff's alcohol consumption continued to be heavy; that plaintiff continued to experience intermittent vomiting, which Dr. Kreider believed to be related to his alcohol consumption; and that plaintiff has a history of high blood pressure related to his drinking. Dr. Kreider noted his belief that plaintiff's recent hospitalization was related to his hyponatremia and excessive alcohol consumption, rather than an actual heart attack. Dr. Kreider also noted that he would get the hospital records because plaintiff was not given any cardiac medication at the time of discharge. Dr. Kreider stressed to plaintiff the importance of

32

limiting his alcohol consumption and eating several meals a day. (R. 351).

Plaintiff saw Dr. Kreider for a medication check on September 17, 2002.  Dr. Kreider noted that plaintiff's blood pressure was a "little better" and his chest pains were gone. Plaintiff indicated that he had not seen the physician who had treated him for kidney cancer for a long time, and Dr. Kreider instructed plaintiff to make an appointment with the doctor in the next month.  (R. 350).

Plaintiff's next medication check with Dr. Kreider took place on December 10, 2002.  At that time, plaintiff reported that he continued to drink and smoke.  Dr. Kreider noted that plaintiff's blood pressure was elevated at 130/100, and that plaintiff had a "very ruddy appearance to his face."  Dr. Kreider described his assessment as follows:

**ASSESSMENT:** 1. Hypertension.  This needs better control. 2. History of coronary artery disease with myocardial infarction but still noncompliant with not smoking and not drinking.  Unsure also about additional lifestyle changes. 3. Chronic back pain. 4. Abnormal electrolytes with elevated potassium and low sodium.  The etiology for this is uncertain.  Alcohol induced?

Plaintiff was given new prescriptions for his medications.  (R. 349).

Plaintiff saw Dr. Kreider for a follow-up visit for his hypertension on January 20, 2003.  Plaintiff reported that he

33

continued to drink alcohol heavily and to smoke, but that he felt
good overall.  Dr. Kreider's assessment included hypertension,
GERD, COPD, alcoholism, hyponatremia, hyperkalemia and anxiety.
Dr. Kreider adjusted plaintiff's medications and recommended that
he discontinue the use of alcohol.  (R. 348).

     Plaintiff saw Dr. Kreider for a follow-up visit on February
4, 2003.  Plaintiff reported that since the change in his blood
pressure medication, he felt better than he had in a long time,
although he continued to suffer from shortness of breath,
fatigue, weakness and sinus problems.  Plaintiff also reported
that he continued to drink heavily, eating only two times a week
which was typical for him due to the alcoholism.  Dr. Kreider's
assessment included hypertension, hyponatremia, hyperkalemia,
hypoosmolality, probable cirrhosis with history of chronic
alcoholic hepatitis and chronic rhinitis.  Dr. Kreider indicated
that various tests would be ordered and plaintiff would be seen
in two weeks.  Plaintiff's need to decrease his alcohol
consumption was discussed again.  (R. 347).

     During the follow-up visit on February 18, 2003, plaintiff's
leg edema persisted, although it was better as a result of the
medication prescribed by Dr. Kreider, and plaintiff indicated
that he continued to drink alcohol heavily.  Dr. Kreider's
assessment included hyponatremia, edema, cirrhosis and

34

hypertension, and plaintiff was instructed to return in four
weeks. (R. 346).

### 23. Records of United Community Hospital - 2/28/03

On February 28, 2003, plaintiff presented to the Emergency
Department of United Community Hospital complaining of shortness
of breath and wheezing. With respect to plaintiff's physical
examination, the hospital's records indicate that plaintiff had
diminished breath sounds bilaterally with inspiratory and
expiratory wheezing and a markedly diminished amount of air
movement. The assessment was described as acute bronchospasm,
hyponatremia and alcoholism. The plan for plaintiff included
admission to the Intensive Care Unit for an aggressive IV steroid
nebulizer regimen, an increased IV sodium protocol and
observation for DVTs based on the fact that plaintiff had
presented to the Emergency Department in an intoxicated state.
(R. 325-27).

Plaintiff was discharged from the hospital on March 4, 2003
with the following diagnoses: acute bronchospasm, hyponatremia,
hypertension, chronic tobacco abuse, alcoholism and a history of
renal cell carcinoma. The discharge summary stated that
plaintiff's problems were recurring "secondary to his chronic
alcohol and tobacco abuse. He has no desire to seek any therapy
in order to discontinue with his present lifestyle." (R. 328).

**24. Records of Randy M. Kreider, M.D. - 3/24/03 to 5/7/03**

On March 24, 2003, plaintiff was seen by Dr. Kreider for a follow-up visit in connection with his hospitalization for COPD in early March. Plaintiff reported that he continued to drink alcohol heavily; that his appetite was "okay;" that he continued to get short of breath easily; and that he still smoked. Dr. Kreider's assessment included COPD, leg edema and cirrhosis with hyponatremia, and the doctor instructed plaintiff to return in a month. (R. 345).

When seen by Dr. Kreider for a follow-up visit on May 7, 2003 for COPD, hypertension, coronary artery disease, low sodium and lumbosacral pain, plaintiff indicated that he was "doing well overall." Plaintiff also reported that he continued to drink alcohol heavily, although he was trying to cut back his smoking. With regard to plaintiff's chronic low back pain, Dr. Kreider noted that a TENS unit and physical therapy had not helped plaintiff, and that medication was the only treatment that helped plaintiff "to maintain some functional capability." Dr. Kreider's assessment included COPD, hypertension, coronary artery disease, hyponatremia and chronic low back pain, and he indicated that various tests would be ordered. Dr. Kreider instructed plaintiff to continue to try to avoid alcohol and discontinue tobacco, and the doctor noted that plaintiff's problem with low

sodium levels "[would] not get better until his alcohol problem

is resolved." (R. 343).

### 25. Report of X-rays and CT Scan - 5/16/03

Plaintiff underwent x-rays and a CT scan on May 16, 2003.

The impressions of these diagnostic tests were described as

follows:

**Chest x-ray:**

IMPRESSION: No acute process identified. No significant
interval change.

**Lumbar spine x-rays:**

IMPRESSION: Mild osteoarthritis of the lower thoracic upper
lumbar spine has progressed slightly since previous study.
No acute process identified. Given the patient's history of
surgical absence of right kidney, total body bone scan or
lumbar spine MRI study may be of further diagnostic value.

**CT scan of the abdomen and pelvis:**

IMPRESSION: 1. Probable small volume averaged cyst
within the superior pole of the left
kidney posteriorly. Again this is
difficult to state with certainty due to
the small size. In attempt of further
characterization with left renal
ultrasound may be of value.
2. Surgically absent right kidney.
3. Increased attenuation within the right
inguinal region possibly related to
previous hernia repair or possibly
dystrophic calcification. This finding
can be correlated with the patient's
history.

(R. 308-11).

37

**26. Records of Randy M. Kreider, M.D. - 6/2/03 to 7/16/03**

When plaintiff saw Dr. Kreider for a follow-up visit on June 2, 2003, his blood pressure was "a little higher." Plaintiff reported that he only consumed "about six beers per day," and Dr. Kreider noted that plaintiff's kidney specialist opined that his hyponatremia was due to alcoholism. Plaintiff reported chronic fatigue and shortness of breath "even at rest." Dr. Kreider noted that plaintiff was scheduled to see a neurosurgeon the following week for increased back pain and swelling in his legs, and an examination of plaintiff's back revealed a chronic decrease in his range of motion. Dr. Kreider's assessment included hypertension, fatigue, COPD with shortness of breath, edema and probable benign prostatic hyperplasia. Plaintiff was instructed to decrease his alcohol consumption and return in one month. (R. 341).

Dr. Kreider's records include a report of a pulmonary function study on July 16, 2003, which describes plaintiff's diagnoses as follows: "Moderate obstructive ventilatory defect with an immediate response to aerosolized bronchodilators with air trapping present. Mild defect in gas transfer." (R. 377).

## III. Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)), which provides

38

that an individual may obtain judicial review of any final
decision of the Commissioner by bringing a civil action in the
district court of the United States for the judicial district in
which the individual resides.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## B. The 5-Step Sequential Evaluation Process

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

\*   \*   \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

39

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity.  The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

\*   \*   \*

40

220 F.3d at 118-19.

With respect to ALJ Pileggi's evaluation of plaintiff's application for SSI following the second hearing, steps one and two of the sequential evaluation process were resolved in plaintiff's favor: that is, based on the record, ALJ Pileggi found that plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability, and that plaintiff suffers from severe impairments, including COPD, osteoarthritis in the lower back and alcoholism. Turning to step three, ALJ Pileggi found that plaintiff's impairments were not sufficiently severe to meet or equal any of the listings in Part 404, Subpart P, Appendix 1 of the Social Security Regulations. As to step four, ALJ Pileggi found that plaintiff's RFC precluded the performance of his past relevant work as a construction laborer, which the vocational expert classified as heavy work. Finally, regarding step five, based on the testimony of the vocational expert, ALJ Pileggi found that plaintiff was capable of performing a limited range of light and sedentary work existing in significant numbers in the national economy.

## C. Plaintiff's Arguments in Support of Summary Judgment

In the brief filed in support of his motion for summary judgment, plaintiff raises several arguments which the Court will address seriatim.

41

i

With respect to the medical evidence regarding plaintiff's limitations in the area of concentration, plaintiff asserts that ALJ Pileggi "explains away significant medical and mental problems by misstatements of the records." Specifically, plaintiff maintains that ALJ Pileggi dismissed Dr. Tartar's opinion that plaintiff is markedly limited in his ability to maintain concentration based on plaintiff's admission that he plays cards without "supporting documentation about what kind of cards he plays, how good he is, how long he can play, how good his concentration is when he does play." (Document No. 17, p. 3).

Contrary to plaintiff's assertion, ALJ Pileggi's determination that plaintiff is not significantly limited in his ability to concentrate was not based solely on the fact that plaintiff is able to play cards. Rather, when explaining his reasons for rejecting the opinion of Dr. Tartar, as well as the opinion of Dr. Craig, concerning plaintiff's limitations in the area of concentration, ALJ Pileggi also noted that (a) during his testimony at the second hearing, plaintiff failed to testify concerning concentration difficulties; (b) Dr. Craig's findings during plaintiff's mental status examination did not support his opinion that plaintiff's ability to maintain attention and concentration was poor to none; and (c) Dr. Tartar and Dr. Craig

42

.       .

acknowledged that plaintiff's excessive consumption of alcohol

likely causes some of his mental functional limitations.[24]   (R.

255).  Under the circumstances, the Court is compelled to

conclude that substantial evidence supports ALJ Pileggi's finding

with respect to plaintiff's ability to concentrate.

ii

Plaintiff also asserts that ALJ Pileggi erred by rejecting

the opinion of Dr. Limkakeng that he was permanently disabled due

to kidney cancer, chronic back pain and alcoholism.  (Document

No. 17, p. 3).  After consideration, the Court finds plaintiff's

argument unpersuasive.

Section 416.927(d) of the Social Security Regulations

provides that (1) the opinion of a treating source on the issues

of the nature and severity of a disability claimant's impairment

_____

[24]As noted previously, Dr. Tartar opined that despite
significant limitations in social functioning and concentration,
plaintiff would be able to perform routine, repetitive tasks in a
stable environment if he stopped abusing alcohol.  (R. 192).
Similarly, in his report of plaintiff's consultative
psychological evaluation, Dr. Craig noted that plaintiff's
prognosis would be "fair," rather than "poor," if he attended a
"behaviorally oriented, structured treatment program to help him
control his alcoholism."  (R. 101).  In this connection, the
Court notes that Section 423(d)(2)(C) of the Social Security Act
was enacted on March 29, 1996 as part of the Contract with
America Advancement Act, Pub.L. No. 104-121, § 105, 110 Stat.
847, 852 (1996), to discourage drug and alcohol abuse.  Section
423(d)(2)(C) provides: "An individual shall not be considered to
be disabled for purposes of this subchapter if alcoholism or drug
addiction would (but for this subparagraph) be a contributing
factor material to the Commissioner's determination that the
individual is disabled."

43

is entitled to controlling weight when the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," and (2) the Social Security Administration "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." See 20 C.F.R. § 416.927(d)(2).

In his decision, ALJ Pileggi adequately explained the basis for his rejection of Dr. Limkakeng's opinion that plaintiff is permanently disabled. First, ALJ Pileggi noted that Dr. Limkakeng's opinion was not rendered in connection with plaintiff's claim for SSI. Rather, the conclusory opinion was set forth in a "generic employability assessment form" completed for the Pennsylvania Department of Public Welfare, and such reports have limited significance in Social Security cases. See, e.g., Hartranft v. Apfel, 181 F.3d 358 (3d Cir.1999)(Physician's report made in connection with workers' compensation claim had limited significance in determining whether claimant was entitled to Social Security disability insurance benefits).

Second, and more importantly, ALJ Pileggi noted that Dr. Limkakeng's opinion was not supported by his own treatment records or by the required laboratory testing or clinical findings. With respect to plaintiff's kidney cancer, the medical

44

condition for which plaintiff was treated by Dr. Limkakeng, the doctor's records indicate that plaintiff did well following the right nephrectomy in January 1998, and subsequent diagnostic testing failed to reveal any significant abnormalities in plaintiff's abdomen and pelvis. As to Dr. Limkakeng's reference to chronic back pain in connection with his opinion that plaintiff is permanently disabled, Dr. Limkakeng did not treat plaintiff for his back condition and the objective medical evidence in the record at the time Dr. Limkakeng rendered his opinion on March 29, 2000 does not support a finding that plaintiff's chronic back pain was disabling in and of itself. Specifically, an MRI of plaintiff's lumbar spine on May 21, 1999 showed some degenerative disc disease at T11-12 with a bulging disc and a mildly bulging disc at L3-4. Otherwise, the MRI of plaintiff's lumbar spine was described as unremarkable. Similarly, the results of the October 25, 1999 physical examination of plaintiff by Dr. Fye, an orthopedic specialist, do not support plaintiff's claim of disabling back pain. In particular, Dr. Fye noted that plaintiff was in "mild distress;" that an inspection of the soft tissue in plaintiff's spine was "unremarkable;" that although plaintiff's range of motion in his lumbar spine was decreased, his straight leg raising tests in the supine and sitting positions were negative; and that plaintiff was "intact" neurologically with respect to motor, sensory and

reflexes of both lower extremities.  In addition, Dr. Fye opined
that neither surgical intervention nor injections were warranted,
and he recommended that plaintiff continue his conservative
treatments of anti-inflammatories and a home exercise program.
Finally, as to Dr. Limkakeng's reference to alcoholism in
connection with his opinion that plaintiff is permanently
disabled, as noted in footnote 24, plaintiff is not entitled to
SSI if alcoholism is a contributing factor material to the
determination that he is disabled.

       Based on the foregoing, the Court concludes that substantial
evidence supports ALJ Pileggi's rejection of Dr. Limkakeng's
opinion that plaintiff is permanently disabled.

                                  iii

       Plaintiff also asserts that the testimony of the vocational
expert does not support ALJ Pileggi's disability determination
"if claimant's counsel (sic) questions to the vocational expert
are considered."  (Document No. 17, p. 3).  After consideration,
the Court concludes that this argument is meritless.

       As noted previously, ALJ Pileggi asked the vocational expert
to assume a hypothetical person of plaintiff's age, education and
work experience with a RFC to perform light and sedentary work
with the following limitations: (1) due to lung problems, the
person would not be able to work in an environment with pulmonary
irritants, (2) due to dizziness, the person would not be able to

                                  46

work at heights or engage in climbing activities; and (3) due to bowel and bladder problems, the person would need to work in reasonable proximity to restroom facilities. Following the vocational expert's testimony that such a person would be able to perform jobs existing in significant numbers in the national economy and his identification of some of those jobs, plaintiff's counsel was given an opportunity to question the vocational expert.

A review of the hearing transcript shows that counsel's questions were limited to the hypothetical person's alleged need for extra bathroom breaks due to bowel and bladder problems.[25]   In response to counsel's questioning, the vocational expert testified that (a) although employees are expected to use the bathroom facilities during normal breaks, additional trips to the bathroom would be allowed as long as the number and amount of time was reasonable, i.e., "a couple in the morning and a couple in the afternoon certainly not to exceed a few minutes;" and (b) the specific jobs cited in response to ALJ Pileggi's hypothetical questions would allow an employee to take additional bathroom

_____

[25]With respect to the hypothetical person's alleged need to work in reasonable proximity to bathroom facilities, ALJ Pileggi noted that he gave plaintiff the "benefit of the doubt" concerning this limitation because he could find little, if any, support in the record for it (R. 286), and the Court notes that its review of the medical evidence also fails to reveal any support for plaintiff's claim of bowel and bladder urgency.

47

breaks because there was "usually more than one person on the job. So, that's no problem." (R. 288-89). Simply put, the vocational expert's responses to counsel's questions do not conflict with, or undermine, his responses to ALJ Pileggi's hypothetical questions and do not support plaintiff's argument in this regard.

iv

Next, plaintiff asserts that ALJ Pileggi erred by failing to include all of the limitations resulting from his impairments in the hypothetical questions posed to the vocational expert. (Document No. 17, p. 6). Plaintiff, however, fails to identify the limitations which were allegedly omitted from the hypothetical questions posed by ALJ Pileggi. Accordingly, the Court is unable to address this argument.

v

Next, plaintiff asserts that ALJ Pileggi erred by failing to consider his medications and their side effects. (Document No. 17, p. 6). In this connection, plaintiff testified during the first hearing before ALJ Pileggi that he does not drive due to his medications (R. 226), and that if he takes all his medications, they make him drowsy and he sleeps a lot. (R. 233). Similarly, during the second hearing before ALJ Pileggi, plaintiff testified that he is "always tired" because "just about every one of [his medications] cause drowsiness." In addition,

48

one of his medications, "a fluid pill," causes him to get up
"about every hour" during the night to go to the bathroom. As a
result, he "sleep[s] most of the day away" due to drowsiness.
(R. 278-79).

Under the Social Security Regulations, one of the factors to
be considered in connection with a claimant's symptoms, including
pain, is "[t]he type, dosage, effectiveness, and side effects of
any medication" the claimant takes to alleviate his or her pain
or other symptoms. 20 C.F.R. § 416.929(c)(3). A review of ALJ
Pileggi's decision shows that he did, indeed, fail to address
plaintiff's testimony at both hearings concerning his constant
drowsiness due to the numerous medications he takes on a daily
basis.[26]  Accordingly, the case will be remanded for consideration
of this issue.

vi

Finally, plaintiff asserts that ALJ Pileggi erred by failing
to explain how his past relevant work as a construction laborer
"would be any different from a sedentary position." (Document
No. 17, p. 6). Clearly, this argument is meritless. In his
decision, ALJ Pileggi specifically noted that plaintiff's past
relevant work (masonry and concrete finishing) is classified as

---

[26]This omission is particularly interesting in light of ALJ
Pileggi's citation of 20 C.F.R. § 416.929(c)(3) in connection
with his determination of plaintiff's RFC.  (R. 256).

49

heavy work,[27] and that in light of his RFC, plaintiff is precluded from performing his past relevant work due to the lifting and carrying requirements of such work.

## D. Conclusion

In addition to ALJ Pileggi's failure to address the alleged side effects of plaintiff's numerous medications, the Court concludes that the case also must be remanded for further proceedings based on ALJ Pileggi's failure to mention or refute some of the contradictory medical evidence in the record. See Burnett v. Commissioner of Social Security Admin., 220 F.3d 112 (3d Cir.2000)(Failure of ALJ in Social Security disability proceeding to mention or refute some of the contradictory, objective medical evidence before him in making his residual functional capacity determination was reversible error). Specifically, the administrative record in this case contains extensive records from Dr. Kreider, plaintiff's primary care physician, who has treated plaintiff for years for a number of chronic conditions, including COPD, uncontrolled high blood pressure, chronic back pain and alcoholism. (R. 146-55, 338-94). Yet, in his decision, ALJ Pileggi referred to Dr. Kreider's

---

[27]The Social Security Regulations define heavy work as follows: "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work." 20 C.F.R. § 404.1567(d).

records only once.  (R. 259).  Most significantly, ALJ Pileggi
failed to address Dr. Kreider's statement in office notes from
August 1999 that plaintiff was permanently disabled by asthma and
anxiety (R. 150), and the doctor's statement in office notes from
May 7, 2003 that medication was the only treatment which helped
plaintiff "to maintain some functional capability" as a result of
his chronic back pain.  (R. 343).  Due to ALJ Pileggi's failure
to address this probative evidence from plaintiff's long-time
treating physician, the Court is unable to determine whether he
failed to credit it or simply ignored it.  See, e.g., Morales v.
Apfel, 225 F.3d 310, 317 (3d Cir.2000), citing, Plummer v. Apfel,
186 F.3d 422, 429 (3d Cir.1999)(quoting Rocco v. Heckler, 826
F.2d 1348, 1350 (3d Cir.1987)("A cardinal principle guiding
disability eligibility determinations is that the ALJ accord
treating physicians' reports great weight, especially 'when their
opinions reflect expert judgment based on a continuing
observation of the patient's condition over a prolonged period of
time.'").  As a consequence, the case will be remanded for
further consideration of the medical evidence and opinion

provided by Dr. Kreider, as well as consideration of the alleged
side effects from plaintiff's medications.[28]

*William L. Standish*

William L. Standish
United States District Judge

Date: March **22**, 2007

---

[28]On remand, the Court recommends that either the
Commissioner or plaintiff's counsel obtain an opinion from Dr.
Kreider regarding plaintiff's ability to perform work-related
physical activities based on the doctor's lengthy history of
treating plaintiff for various chronic conditions.  In addition,
in light of 42 U.S.C. § 423(d)(2)(C), if such an opinion is
obtained from Dr. Kreider and the opinion supports a
determination that plaintiff is disabled from substantial gainful
activity, the Court further recommends that another opinion be
solicited from Dr. Kreider concerning the issue of whether
plaintiff's long history of alcohol abuse is a contributing
factor material to his opinion that plaintiff is disabled.